IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ROBIN BENNETT,**                                 Case No. 1:18 CV 919

      Plaintiff,                                   Judge John R. Adams

      v.                                           Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                   REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff Robin Bennett ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated April 23, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in October 2015, alleging a disability onset date of January 1, 2015. (Tr. 200, 210).[1] Her claims were denied initially and upon reconsideration. (Tr. 120, 129, 138, 145). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 150).

---

1. Plaintiff later amended her alleged onset date to September 12, 2015, following an unfavorable decision on a prior application dated September 11, 2015. *See* Tr. 15, 28, 62-65.

Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on June 7, 2017. (Tr. 26-49). On June 29, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-21). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on April 23, 2018. (Doc. 1).

FACTUAL BACKGROUND

<u>Personal Background and Testimony</u>

Born in 1958, Plaintiff was 59 years old at the time of the ALJ's decision. *See* Tr. 30. Plaintiff alleged disability due to having a single kidney, panic attacks, anxiety, high blood pressure, and high cholesterol. *See* Tr. 244. Plaintiff graduated from high school and completed two years of college. (Tr. 32, 245). She was divorced and had two adult children (ages 25 and 27). (Tr. 31).

In a November 2015 function report, Plaintiff reported working nineteen hours per week, split between two jobs. (Tr. 259). She also prepared meals three times per week for one hour, ironed daily, and cleaned as needed. (Tr. 260). She drove a car, went out alone, and shopped for food and clothing items once per week for about thirty minutes. (Tr. 261). Plaintiff reported difficulty with hearing, stair climbing, memory, and understanding. (Tr. 263). She took Ativan, Lipitor, and Norvasc. (Tr. 265).

At the time of the hearing, Plaintiff lived alone, and had a driver's license. (Tr. 31). She took the train to the hearing and climbed five flights of stairs to get to the hearing room due to a fear of elevators. (Tr. 32-33).

Plaintiff had previously worked as a home health care worker, *see* Tr. 32, 245, 250, and worked part-time (two and one-half hours per day) at the time of the hearing. (Tr. 33).

2

Plaintiff testified she could not work full-time because she tired easily and had 8/10 to 9/10 pain "[a]bout five days a week." (Tr. 34). Plaintiff was taking Ativan, Norvasc, and Lipitor. (Tr. 35).

Plaintiff did not know how long she could walk or sit, but estimated she could stand for fifteen to twenty minutes, and could bend, stoop, and squat. (Tr. 35-36). She also did not know how much she could lift. *Id.*

Plaintiff experienced headaches (Tr. 34), and panic attacks (Tr. 36). She saw a counselor every two months who talked with her and adjusted her medications. (Tr. 37).

Plaintiff was able to attend to personal hygiene, cook, and shop. (Tr. 38-41). Regarding housework, she testified she "do[es] what [she] can, and then [she] sit[s] down." (Tr. 38). She later testified she did "[l]ight housekeeping" at her part-time job including making the bed and vacuuming. (Tr. 46).

Relevant Medical Evidence

Medical evidence pre-dating Plaintiff's alleged onset date demonstrated Plaintiff was taking Norvasc, Crestor, and Ativan. *See* Tr. 294-43. From January 2014 through August 2015, Plaintiff's weight ranged from 193 pounds (Tr. 334 – May 2014) to 207 pounds (Tr. 296 – August 2015), and her BMI was noted to be 36.49 (Tr. 334 – May 2014), 36.8 (Tr. 376 – June 2014), and 37.19 (Tr. 325 – July 2014).

In September 2015, Plaintiff saw a neurologist regarding headaches. (Tr. 290-93). Plaintiff's medications included Ativan, Norvasc, Elavil, Lipitor, and Vitamin D. (Tr. 291). The physician's impression was anxiety and depression, and she recommended a psychiatric evaluation. (Tr. 293).

In October 2015, Plaintiff saw a urologist who noted Plaintiff weighed 207 pounds, and had a BMI of 39.13 (Tr. 288). At this visit, Plaintiff was also noted to have a history of panic disorder, hypertension, and a solitary left kidney. (Tr. 297).

In November 2015, Plaintiff underwent a mental health assessment update (with pharmacologic management) with Margaret Blasse, PCNS[2]. (Tr. 395-400). Plaintiff had been depressed "most days for years", starting with a miscarriage and the birth of her first son, and was "[m]ore depressed lately." (Tr. 396). She reported her last panic attack was "[p]robably years ago." *Id.* Her goals were to feel happy, lose weight, and worry less. *Id.* Plaintiff worked nineteen hours per week for two different home health agencies. *Id.* Plaintiff had been taking Ativan since 2013, and reported it was helpful. (Tr. 397). On mental status examination, Plaintiff's mood was depressed and anxious, and her affect was partially constricted. *Id.* Ms. Blasse assessed major depression, recurrent, mild to moderate. (Tr. 399). Ms. Blasse prescribed Prozac, as well as Trazodone (to help with sleep). (Tr. 399, 401).

In December 2015, Plaintiff participated in a psychological interview with Jeff Rindsberg, Psy.D. (Tr. 387-91). Plaintiff reported having good days and bad days, and that she had never seen a counselor or been hospitalized for mental health issues. (Tr. 388). When asked why she was applying for disability benefits, Plaintiff stated: "Because I want to take care of myself". (Tr. 389). She stated she could not work full-time "because [she was] tired all the time." *Id.* She attributed her fatigue to "old age" and "health issues". *Id.* Plaintiff reported on a typical day, she would get up, make breakfast, get ready for work, and do some laundry. *Id.* She prepared meals, occasionally went out to dinner, and did not have difficulty shopping. *Id.* She stated her biggest problem was

---

2. "PCNS" stands for "Psychiatric Clinical Nurse Specialist". *See, e.g., Antill v. Comm'r of Soc. Sec.*, 2013 WL 3776697, at \*3 (N.D. Ohio).

"probably [her] energy level, but [she did] try to push herself." *Id.* Dr. Rindsberg noted Plaintiff had low energy, but it was unclear whether she was depressed or had a significant history of anxiety. (Tr. 391).

Later that same month, Plaintiff saw a physician for a cough and fatigue. (Tr. 392-94). She weighed 207 pounds (BMI 39.21). (Tr. 392).

In January 2016, Plaintiff returned to Ms. Blasse reporting her mood was up and down, but "more down." (Tr. 405). She also reported she did not take the prescribed Prozac. *Id.* Plaintiff described herself as a worry wart; Ms. Blasse noted she "[t]rie[d] to keep busy to cope" and "[l]ike[d] to walk." *Id.* Ms. Blasse continued her diagnosis of major depression, recurrent, mild-moderate and encouraged Plaintiff to take the Prozac. (Tr. 406) ("Noncompliance with Prozac due to anxiety about the [P]rozac and any antidepressant."). In February, Plaintiff reported she took half a capsule of Prozac, but it "made her feel jumpy". (Tr. 411). She reported feeling depressed "not daily but does not know how often". *Id.* Her mood was depressed and anxious and her affect partially constricted. *Id.* Ms. Blasse continued her prior diagnosis. (Tr. 412).

In March 2016, Plaintiff saw Rochele Beachy, M.D., for a complete physical. (Tr. 418-25). Plaintiff weighed 209 pounds (BMI 39.53). (Tr. 418). She reported taking Ativan for anxiety and that nothing else worked. *Id.* Dr. Beachy was concerned Plaintiff might be overusing Ativan and that it might be contributing to her fatigue. (Tr. 421). Dr. Beachy refilled Plaintiff's Ativan, but noted she "likely need[ed] her Lexapro increased or med changed". *Id.* She also ordered a sleep study. *Id.*

In May, Plaintiff saw George Saab, M.D., to follow up on her solitary kidney. (Tr. 438). Plaintiff weighed 205 pounds (BMI 38.91). *Id.* She was noted to be taking Ativan and Lexapro. (Tr. 439). Her mood and affect were normal. *Id.* Plaintiff returned to Dr. Saab in November 2016.

5

(Tr. 472). She weighed 209 pounds (BMI 39.66). *Id.* Plaintiff had a normal mood and affect and was taking Ativan. (Tr. 473). Her renal function was stable. (Tr. 474).

In December 2016, Plaintiff returned to Dr. Beachy for ear pain, and hand/finger symptoms ("cold all the time"). (Tr. 487). Plaintiff weighed 212 pounds (Tr. 489). Dr. Beachy instructed Plaintiff to, *inter alia*, exercise three times per week at home. (Tr. 490).

In visits with Ms. Blasse through December 2016, Ms. Blasse continued to diagnose major depression, recurrent ("mild to moderate", "mild", or "moderate"), and anxiety not otherwise specified. (Tr. 406, 412, 433, 446, 453, 460, 467, 482, 497). On mental status examination, she noted each time Plaintiff had a depressed and anxious mood, and partially constricted affect. (Tr. 405, 411, 432, 445, 452, 459, 466, 497). Plaintiff's goals remained to feel happy, lose weight, and worry less. (Tr. 406, 411, 432, 445, 452, 459, 466, 496). She was repeatedly noted to be reluctant to see a counselor "as she is a private person." (Tr. 412, 433, 446). Plaintiff continued to take Ativan, and briefly tried Lexapro, Cymbalta, and Remeron. *See* Tr. 446 ("Noncompliance with [L]exapro due to side effect of headache."); Tr. 453 ("add [R]emeron 15 mg at bedtime."); Tr. 460 ("discontinue [R]emeron . . . Add [C]ymbalta 20 mg 2x daily."); Tr. 466 -67 ("got scared and did not take the [C]ymbalta", agreed again to take it); Tr. 482-84 (add Cymbalta, "[p]lease give the Cymbalta . . . a chance to work."); Tr. 496 (took Cymbalta, but not at full dosage recommended); *see also* Tr. 452 ("does not like to take a lot of medicine"). Plaintiff was noted repeatedly to be anxious about and resistant to adding an antidepressant medication (Tr. 460, 467, 483, 497), though Ms. Blasse described her as "clearly depressed". (Tr. 460, 467, 497). Plaintiff's weight at these appointments ranged from 203 pounds (Tr. 451) to 210 pounds (Tr. 465). In August 2016, Ms. Blasse noted: "If you want to feel better you will need to be willing to accept a different treatment method." (Tr. 448).

*Opinion Evidence*

    *Physical*

In November 2015, state agency physician Gary Hinzman, M.D., reviewed Plaintiff's records. (Tr. 79-83). He noted Plaintiff's BMI at a July 2014 appointment was 37.19 (weight: 196 pounds). (Tr. 79). He specifically noted that "[t]his level II obesity is not currently having an adverse impact on functional status." *Id.* He also noted Plaintiff's weight was 207 pounds at an October 2015 appointment. *Id.* Dr. Hinzman opined Plaintiff had no severe physical medically determinable impairment. *Id.*

In March 2016, state agency physician Gail Mutchler, M.D., reviewed Plaintiff's records, including a note from December 2015 that Plaintiff's weight was 207 pounds, and BMI was 39. (Tr. 113-14). She concurred with Dr. Hinzman's assessment that Plaintiff had no severe physical medically determinable impairment. (Tr. 114).

    *Mental*

In December 2015, Dr. Rindsberg opined Plaintiff could understand, remember, and carry out instructions without difficulty. (Tr. 391). He did not believe she would have difficulty maintaining attention, concentration, persistence, or pace. *Id.* He noted that her ability to deal with supervisors and coworkers "could be affected by her low energy", but also noted "[y]et, she does work with clients and seemingly does so without difficulty." *Id.* Dr. Rindsberg opined Plaintiff's ability to handle pressure in a work environment "could be a problem due to her low energy and perseverance" and "depressed affect." *Id.*

In January 2016, state agency psychologist Melanie Bergsten, Ph.D., reviewed Plaintiff's records and opined that "[t]he evidence does not support any significant limitations related to her mental health" and "[o]verall it is determined no severe psychological [medically determinable

impairments] at this time." (Tr. 81). State agency psychologist Kristen Haskins, Psy.D., concurred in March 2016. (Tr. 105).

ALJ Decision

In his written decision dated June 29, 2017, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through December 31, 2019. (Tr. 18). He also found Plaintiff had not engaged in substantial gainful activity since September 12, 2015 (the amended alleged onset date). *Id.* He then concluded Plaintiff had medically determinable impairments of: mild obesity, unspecified depressive disorder, benign hypertension, congenital absence of right kidney, history of headaches, and hypercholesterolemia. *Id.* However, the ALJ found that none of these impairments, individually or in combination "significantly limited (or [wa]s expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore . . . [she] does not have a severe impairment or combination of impairments." *Id.* Therefore, the ALJ found Plaintiff was not disabled form September 12, 2015 through the date of his decision. (Tr. 21).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*,

474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff alleges the ALJ erred in denying her claim at "Step Two" of the disability evaluation process. *See* Tr. 18. Plaintiff asserts this determination is not supported by substantial evidence and the ALJ should have found Plaintiff's obesity, depression, and anxiety, either individually or in combination, were "severe" impairments within the regulatory definition. *See* Doc. 11, at 12-15. Within her argument, she contends the ALJ failed to properly evaluate Plaintiff's obesity, and improperly relied upon the opinions of the state agency reviewing physicians who did not review the entire record. *See id.* The Commissioner responds that substantial evidence supports the ALJ's decision, and it should therefore be affirmed. (Doc. 14, at 5-10). For the reasons discussed below, the undersigned recommends the Court reverse the Commissioner's decision and remand for further proceedings.

Step Two Analysis

At Step Two, Plaintiff has the burden of showing she suffers from a severe impairment, which is an "impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c); 416.920(c). "Basic work activities" means "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1522(b), 416.922(b). Examples of these include the following:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

> (2) Capacities for seeing, hearing, and speaking;

10

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

*Id.*

The Sixth Circuit has construed Plaintiff's burden at Step Two as "a *de minimis* hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The inquiry is therefore "employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Id.* at 863. Under this analysis, an impairment is not severe "only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* at 862; *see also Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985) ("[T]he question [at Step Two] ... is whether there is substantial evidence in the record supporting the ALJ's finding that [Plaintiff] has only a 'slight' impairment that does not affect [her] ability to work."). However, while Plaintiff bears a *de minimis* burden, "[t]he mere diagnosis [of an impairment], of course, says nothing about the severity of the condition." *Higgs*, 880 F.2d at 863. Thus, if no signs or laboratory findings substantiate the existence of an impairment or if such an impairment or combination of impairments does not significantly limit the ability to do basic work activities, it is appropriate to terminate the disability analysis. *See* SSR 96-4p, 1996 WL 374187, at *2; 20 C.F.R. § 404.1520(c), 416.920(c) ("If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.").

*Depression / Anxiety*

Plaintiff argues that the ALJ should have classified depression and anxiety as severe impairments, either individually, or in combination with her obesity. *See* Doc. 11, at 13. The Commissioner, aside from parroting back the ALJ's language and analysis (*see* Doc. 14, at 7-8), and offering general statements such as "Plaintiff failed to produce evidence to show that her impairments were severe" (*id.* at 9), does not expressly respond to Plaintiff's argument about her mental impairments.

In finding Plaintiff's mental health impairments not severe, the ALJ relied upon the state agency physicians who offered such an opinion in January and March 2016. *See* Tr. 20. He then stated:

> Even considering the more recent evidence submitted by the claimant prior to the hearing, the weight of the objective medical findings failed to demonstrate any significant change in the claimant's physical or mental functioning, or any increase in reports of symptomology, to suggest that her impairments have resulted in more than minimal work-related limitation.

*Id.* He did not explicitly discuss any of this later-submitted evidence, which consisted of, *inter alia*, treatment notes from Ms. Blasse and Dr. Beachy. *See* Tr. 404-540.[3] He also evaluated the "paragraph B" criteria of Section 12.00C of the Listing of Impairments (20 C.F.R. Pt. 404, Subpt. P., App'x 1), and found Plaintiff had no more than "mild" limitation in understanding, remembering, or applying information; interacting with others; concentration, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 20-21). In so doing, the ALJ found Plaintiff had no limitation in adapting or managing herself despite Dr. Rindsberg's consultative opinion that Plaintiff might have some difficulty handling work pressures. (Tr. 21) (citing Tr. 391)

---

3. In fact, the ALJ only cited generally Exhibit 4F (Tr. 404-39), which covered the time period from January to May 2016. *See* Tr. 20. Nowhere did he cite Exhibits 5F (Tr. 440-81) or 6F (Tr. 482-540), which covered the time period after May 2016.

("Handling pressure in a work environment could be a problem due to her low energy and perseverance. That is related to her low energy and depressed affect."). The ALJ explained:

> Despite that opinion, there was no evidence of a significant change in the claimant's physical or mental complaints to treating sources at the time she alleged she was no longer able to perform fulltime work. Her mental status has remained unremarkable, she maintained the ability to live alone and to manage her own healthcare and finances, and there was no evidence of increased fatigue or anxiety during this time.

(Tr. 21).

Plaintiff points to the evidence from her treating sources – Dr. Beachy and Ms. Blasse – who diagnosed anxiety and depression, as well as records showing Plaintiff was prescribed and took medication for both anxiety and depression during the relevant time period. *See* Doc. 11, at 13. Contrary to the ALJ's statement that Plaintiff's mental status "remained unremarkable", Ms. Blasse repeatedly noted on mental status examination that Plaintiff had a depressed and anxious mood, and partially constricted affect. (Tr. 405, 411, 432, 445, 452, 459, 466, 496). Further, the ALJ's statement that there was "no evidence of increased fatigue or anxiety during this time" is contradicted at least to some degree by the record. *See* Tr. 406 (noncompliance with medication due to anxiety); Tr. 460 ("Anxious and resistant to adding antidepressant even though patient is clearly depressed."); Tr. 466 ("got scared and did not take the [C]ymbalta"; Tr. 467 ("Anxious about adding antidepressant and patient is clearly depressed."); Tr. 497 ("Anxious about adding antidepressant and patient is clearly depressed.").

Further, the ALJ relied in part on outdated state agency physician opinions to find Plaintiff's mental impairments non-severe. The Court recognizes that it is not *per se* error to rely on a state agency physician's opinion when that physician has not reviewed the entire record, so long as the ALJ considers the post-dated evidence in formulating his opinion. *See McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009); *Ruby v. Colvin*, 2015 WL 1000672, *4

13

(S.D. Ohio) ("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion."); *cf. Blackley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 401 (6th Cir. 2009) ("And because much of the over 300 pages of medical evidence reflects ongoing treatment and notes by Blakley's treating sources, we require some indication that the ALJ at least considered these facts before giving greater weight to an opinion that is not based on a review of a complete case record.") (internal quotations and citations omitted).

Here the ALJ relied on state agency opinions regarding mental impairments – offered in December 2015 and January 2016 (based on records through December 2015) – finding Plaintiff did not have any severe impairments. (Tr. 20) (citing Tr. 81, 105). Notably, these physicians did not have Ms. Blasse's or Dr. Beachy's 2016 treatment records. Although the ALJ stated he considered the later-submitted evidence (Tr. 20), as discussed above, his analysis does not comport with the records themselves, nor does he anywhere cite specific records.

Finally, the Court is troubled by the ALJ's truncated analysis, which ends at Step Two, despite finding that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms." (Tr. 19). The ALJ went on to clarify that Plaintiff's symptoms were not credible to the extent that they were inconsistent with his conclusion that they were non-severe:

> Accordingly, these statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence.
>
> In terms of the claimant's alleged work-related physical and mental limitations, the weight of the evidence fails to demonstrate symptoms that have caused more than a minimal limitation on the claimant's ability to perform work activities.

*Id.* However, this analysis seems inconsistent with the very low standard for severity. Therefore, because this is not a case where the mental health impairment claims are "totally groundless",

14

*Nejat*, 359 F. App'x at 576, the ALJ should have continued with the analysis beyond Step Two. The undersigned therefore recommends the Court remand the case for further proceedings.

*Obesity*

Plaintiff also contends the ALJ failed to properly evaluate her obesity at Step Two. She argues the ALJ should have found it to be a severe impairment, either individually, or in combination with her mental impairments. The Commissioner responds that there is no error.

An ALJ must "consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009). "Obesity is a complex, chronic disease characterized by excessive accumulation of body fat." SSR 02-1p, 2002 WL 34686281, at *2. The Sixth Circuit has explained, however, that an ALJ is not required to use any "particular procedural mode of analysis" in assessing the effect of obesity. *Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. 2006). SSR 02–1p offers detailed guidance on how to assess obesity in conjunction with other impairments. *See Norman v. Astrue*, 694 F.Supp.2d 738, 741–42 (N.D. Ohio 2010) ("this is more than a requirement that the ALJ mention the fact of obesity in passing . . ."). There are three levels of obesity that correlate with BMI levels:

> The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss.

SSR 02–1p, 2002 WL 34686281, at *2. Obesity "commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems" and "may also cause or contribute to mental impairments such as depression." *Id.*, at *3

The ALJ considered Plaintiff's obesity in his Step Two analysis, explaining:

15

> Outpatient records from MetroHealth noted the claimant's mild obesity with normal clinical examination findings, benign hypertension without target organ involvement, congenital absence of a right kidney with normal left kidney function, elevated cholesterol levels with no evidence of significant cardiovascular disease, and history of non-migraine headaches without evidence of neurological impairment. (Exhibits B1F, B4F). Physical examinations were routinely unremarkable for deficits of strength, sensation, gait, or cardiovascular and pulmonary function. Routine renal laboratory studies were consistently within normal limits. The Claimant's weight has remained relatively stable, in Class I obesity, below a BMI of 34.9, with no evidence of weight-related symptoms. She routinely denied pain symptoms in assessments throughout her progress notes, and when she did endorse headaches, she indicated that these improved with over-the-counter Tylenol. There was no treatment for or complaint of shortness of breath or dyspnea on exertion documented in the treatment notes.

(Tr. 19-20).

Preliminarily, Plaintiff is correct that the ALJ's statement that Plaintiff's "weight remained relatively stable, in Class I obesity, below a BMI of 34.9" (Tr. 20), is incorrect and a misstatement of the record. As outlined above, Plaintiff's recorded BMIs during the relevant time period were consistently higher. *See* Tr. 288 (39.13 – October 2015); Tr. 392 (39.21 – December 2015); Tr. 418 (39.53 – March 2016); Tr. 438 (38.91 – May 2016); Tr. 472 (39.66 – November 2016).

However, the ALJ's statement that Plaintiff did not appear to have evidence of *physical* obesity-related restrictions is supported by substantial evidence. But, Plaintiff also argues the ALJ erred in not considering the effect her obesity may have had on her mental health, citing her repeatedly-stated goal to her mental health provider as to "feel happy" and "lose weight." (Doc. 11, at 13) (citing Tr. 396, 405, 411, 432, 444, 452, 453, 459, 466). Because SSR 02-1p does not mandate any "particular procedural mode of analysis", *Bledsoe*, 165 F. App'x at 412, the undersigned would not recommend remand on this basis alone. However, because remand is required for the Commissioner to perform a proper analysis of Plaintiff's mental impairments, the Commissioner should also again consider Plaintiff's obesity at all steps of the analysis on remand, as required by SSR 02-1p, 2002 WL 34686281.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB not supported by substantial evidence and recommends the decision be reversed and remanded for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).


 s/James R. Knepp II
United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).